Angelo P. CIPRARI, Plaintiff,

v.

**SERVICOS AEREOS CRUZEIRO do SUL,
S.A. (CRUZEIRO), Defendant.**

United States District Court
S. D. New York.

July 23, 1964.

**434**

craft crashed near Sao Paulo and plaintiff was injured. Defendant Cruzeiro is a foreign air carrier organized and existing under the laws of Brazil. The complaint was filed on August 30, 1963, and service was made on September 11, 1963. Jurisdiction is founded upon diversity of citizenship of the parties. Defendant now moves to dismiss the action or to quash the service of the summons on the ground that Cruzeiro is not "doing business" in New York so that this court lacks jurisdiction over its person, Fed.R. Civ.P. 12(b)(2), or in the alternative, to dismiss the action pursuant to the court's inherent power, on the ground of *forum non conveniens*.

Arrowsmith v. United Press Int'l., 320 F.2d 219 (2d Cir. 1963) has now settled the proposition that the question of whether a foreign corporation is "doing business" so as to be amenable to suit in a Federal court, where jurisdiction is based upon diversity of citizenship, is governed by the law of the state where the court sits. See also Cook v. Bostitch, 328 F.2d 1 (2d Cir. 1964). But while this court must look to the law of New York State to determine whether Cruzeiro would be subject to its jurisdiction under New York's applicable standards, the inquiry does not end there. For if Cruzeiro's activities are such as to render it amenable to service of process under New York law, then the court must determine whether the exercise of *in personam* jurisdiction would contravene the Fourteenth Amendment's guaranty of due process. "[D]ue process requires only that in order to subject a defendant to a judgment *in personam* * * * he have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' * * * Those demands [of Due Process] may be met by such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there." International Shoe Co.

---

Kreindler & Kreindler, New York City, by Milton G. Sincoff, Jack L. Kroner, Gerald A. Robbie, New York City, of counsel, for plaintiff.

Debovoise, Plimpton, Lyons & Gates, by Samuel E. Gates, Robert B. von Mehren, Robert L. King, New York City, of counsel, for defendant.

EDELSTEIN, District Judge.

Plaintiff Angelo Ciprari, a United States citizen, and a resident of New York, has brought this action for personal injuries against Servicos Aereos Cruzeiro do Sul, S.A., ("Cruzeiro"). On January 15, 1963, plaintiff was a passenger for hire aboard defendant's airplane on a trip from Rio de Janeiro, Brazil, to Sao Paulo, Brazil. The air-

v. Washington, 326 U.S. 310, 316–317, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

Cruzeiro contends that its contacts with the State of New York are insufficient to sustain *in personam* jurisdiction over it since it is a foreign corporation whose main and only business is selling and providing air transportation within Brazil and from Brazil to five South American countries. The defendant asserts that it is not conducting "some substantial part of its main business" in New York since its activity is limited to purchases of spare parts and supplies which are but incidental to its business of air transportation. Cruzeiro argues further that assuming *arguendo* that its activities in New York fall within New York's "doing business" criteria, the exercise of this court's jurisdiction over Cruzeiro would constitute a violation of due process because it would amount to maintaining jurisdiction over a corporation which does not have sufficient minimal contacts with New York to make maintenance of the suit here reasonable.

Its final contention is that this court should exercise its inherent power and dismiss the action on the ground of *forum non conveniens* since in weighing the balance of conveniences the scales tip heavily in its favor. Cruzeiro points out that if the court retains the action it will have to grapple with the interpretation of the concept of "Dolus," [1] a legal concept which is *sui generis* to Civil Law countries. Cruzeiro also urges that the unavailability of compulsory process to compel the attendance of witnesses here, the appropriateness of a view of the premises, the relative ease of access to sources of proof in Brazil, among other hardships detailed below, all indicate that this court should decline jurisdiction, dismiss the action, and remit the plaintiff to the Brazilian courts.

The following undisputed facts concerning Cruzeiro's New York activities appear from the parties' affidavits: Cru-

zeiro's principal office is in Rio de Janeiro, Brazil. Cruzeiro is now and for many years has been engaged solely in the carriage by aircraft of persons, property and mail to and from points within Brazil and other South American points. It has not operated flights to the United States for the past ten years. Its air fleet consists of fifty aircraft, 46 of which are of American manufacture while the remaining four are of French manufacture. Cruzeiro does not have ticket offices in the United States. None of its ticket stock is found in the United States. Cruzeiro is, however, a party to the International Air Transportation Association, (IATA), Interline Traffic Agreement. Pursuant to this agreement, members of IATA, who are the major international air carriers, are authorized to issue their own tickets or other travel documentation for the transportation of persons and property over the routes of Cruzeiro. An IATA Interline Agreement is an undertaking by a carrier to honor tickets issued on the stock of other participating airlines for passage on their own flights. The connecting airline, in this case Cruzeiro, collects that portion of the fare owed it through a clearing house operated by the IATA. Pan American World Airways and Cruzeiro have agreed to the interline agreement and Pan American has authority to issue tickets on its own stock for flights on Cruzeiro. Defendant contends, and it is not disputed, that Pan American is not Cruzeiro's general sales agent and no Pan American-Cruzeiro sales agency agreement is in effect. But see Lawson v. Pan American World Airways, Inc., 30 Misc.2d 274, 216 N.Y.S.2d 549 (Sup. Ct. 1961). Cruzeiro has no salesman here and does not advertise in the United States of America.

Cruzeiro's contacts with the State of New York at the time it was served with process are as follows: Cruzeiro maintains and has maintained for "some

---

1. Dolus is defined as "evil or criminal intent similar to malice at the common law in the law of crimes: wilful and wanton misconduct in the law of delicts" [civil wrongs or torts]. Webster, Third New International Dictionary (unabridged ed. 1963).

time"[2] a purchasing office in the City of New York, located at 39 West 55 Street. Its present office consists of three rooms, having an aggregate floor area of approximately 400 sq. ft. Prior to April 1963 it maintained "somewhat larger"[3] offices at 60 East 42 Street, New York City. Defendant's name is on the door of its offices, and is listed in the building directory. Two employees are employed on a full-time basis at this New York office: Miss Cecile Malouf, its United States Representative, and a "clerical assistant." Miss Malouf has a general power of attorney from Cruzeiro and she uses this authority in her purchasing activities. Miss Malouf's functions, however, are limited exclusively to matters connected with the purchase of spare parts and other equipment necessary for the maintenance and servicing of Cruzeiro's "large fleet of American manufactured aircraft and the maintenance and servicing of American equipment on its four planes of French manufacture, as well as the export of such purchases to Brazil."[4] Dr. J. Benito Ribeiro Dantas, President of Cruzeiro, states in his affidavit in support of the motion that "Since the manufacturers of many of the parts and supplies required by Cruzeiro do not maintain offices or sales representatives in Brazil, Cruzeiro must maintain a purchasing agent in the United States to acquire needed parts and supplies. It would be impossible for Cruzeiro to operate its fleet without access to spare parts and other equipment purchased through its New York purchasing office."[5]

The volume of Cruzeiro's gross operating revenues was given[6] but the sales volume of Cruzeiro's procurement and purchases in the United States was not. All that was mentioned in the Dantas'

affidavit which can serve as a clue as to whether or not Cruzeiro's purchases are substantial was that the sales volume of Cruzeiro's purchases in the United States from year to year varied with the "availability to it of U. S. dollar exchange and its maintenance and servicing requirements." There was no claim that Cruzeiro's United States purchases were insubstantial. Office expenses, including Miss Malouf's salary and the salary of her secretary, amounted to approximately $2,000 per month.

The purchasing office discharges its responsibility in the following manner: Cruzeiro's materiel department, located in Rio de Janeiro, Brazil, sends a detailed list of the purchasing requirements to the New York purchasing office, specifying the make, model and manufacture of the required items. The New York office then assumes full responsibility for the purchase of the materiel. It sends a request for bids to American suppliers of the desired items. The New York office has authority to, and does select the successful bidder, "largely on the basis of price, but also taking into account other factors such as the date of delivery, quality of merchandise, etc."[7] Although the New York office has complete authority to accept or reject bids, occasionally technical advice concerning acceptance of bids is sought from Cruzeiro's principal office. After selecting the successful bidder, the New York office prepares the purchase order and submits it to the supplier.

Payment for purchases is made by the New York office from funds in one of the two bank accounts which Cruzeiro maintains in New York. One bank account is used to pay for the office-expenses and salaries. The other, described in defendant's affidavits as a "larger one," is used

2. Affidavit of J. Bento Ribeiro Dantas, hereafter referred to as "Dantas' Affidavit," p. 2.

3. Ibid. p. 2.

4. id.

5. id.

6. Dantas' affidavit, p. 2.
   1958  Cr$  1,094,149,031
   1959  Cr$  1,420,180,642
   1960  Cr$  1,757,566,326
   1961  Cr$  2,621,735,972
   1962  Cr$  4,055,562,174

7. Affidavit of Cecile Malouf, hereafter referred to as "Malouf affidavit," p. 3.

for the payment of the spare parts and equipment purchased through the New York office. Miss Malouf's power of attorney authorizes her to draw on these two bank accounts and payments for purchases are made through the New York office. On purchases which Cruzeiro terms "non-routine," the New York office sends letters of inquiry to suppliers, as does the principal office in Rio de Janeiro, and decisions on non-routine purchases are made by the principal office. If an inspection of the "goods to be purchased"[8] is required, it is made by technical personnel who work out of the principal office in Rio de Janeiro. Books and records pertaining to Cruzeiro's purchasing activities are maintained in the New York office. Cruzeiro has not volunteered the fact whether or not these technical personnel come to the United States, or to New York, to make their inspections.

New York's Civ.Prac.L.Rules § 301 (effective September 1, 1963), provide that "A court may exercise such jurisdiction over persons * * * as might have been exercised heretofore." Thus the first question for decision is whether defendant was "doing business" in New York according to New York law prior to Civ.Prac.L.Rules. Irgang v. Pelton & Crane Co., 42 Misc.2d 70, 247 N.Y.S.2d 743, 744 (Sup.Ct.1964). New York, not unlike other jurisdictions, has not devised a magical litmus paper test for determining the amenability of a foreign corporation to suit. The attitude of the New York courts toward corporate amenability is demonstrated by the classic statement in the leading New York case on the subject, Tauza v. Susquehanna Coal Corp., 220 N.Y. 259, 267, 115 N.E. 915, 917 (1915): "If in fact [the foreign corporation] is here, if it is here, not occasionally or casually, but with a fair measure of permanence and continuity, then, whether its business is interstate or local, it is within the jurisdiction of our courts. * * * But there is no precise test of the nature and extent of the business that must be done. All that is requisite is that enough be done to enable us to say that the corporation is here."

Defendant has urged that Holzer v. Dodge Bros., 233 N.Y. 216, 135 N.E. 268 (1922), rather than Tauza "is the leading case" that delineates New York's general doing business criteria, but defendant's position is not well taken. Tauza has been, and continues to be, the case most often cited by the New York courts in deciding "doing business" questions. The New York courts look to Tauza as the leading authority, and in commenting upon it, have stated that "[t]he repeated citation of this decision confirms the elasticity of the basic concept." Berner v. United Airlines Inc., 3 A.D.2d 9, 157 N.Y.S.2d 884, 887 (1st Dept. 1956). Moreover, Holzer v. Dodge Bros. supra, involved a situation in which traveling district representatives "aided" defendants franchised dealers and "look[ed] after the interest of the defendant in that locality and report[ed] to it from time to time." 233 N.Y. at 220, 135 N.E. at 269. Neither the district representative nor the general sales manager had authority to make a contract of any kind. The general sales manager was merely a supervisor for the district representatives and his duties were limited to making recommendations which were not binding with respect to any possible changes in sales procedures. Accordingly, it was not startling that the court found that the defendant was not doing "business" and that in Berner v. United Airlines, supra, the court relied on Tauza and distinguished Tauza from Holzer by noting that "the decision in Holzer v. Dodge Brothers * * * turned on the special intramural relation of Dodge with its automobile dealers and did not weaken these general principles." 157 N.Y.S.2d at 887.

A canvass of the New York cases dealing with the question of whether a foreign corporation's purchases within the state render the corporation amenable to the *in personam* jurisdiction of the state's courts uncovers two divergent lines of au-

8. Ibid. p. 3.

438

thority. The watershed of one line, Sterling Novelty Corp. v. Frank & Hirsch Distrib. Co., 299 N.Y. 208, 86 N.E.2d 564, 12 A.L.R.2d 1435 (1949), held that a foreign corporation is subject to the jurisdiction of the New York courts "if it buys merchandise in a systematic and continuing fashion, through an exclusive purchasing agent with an established and permanent place of business in New York." Id. at 212–213 of 299 N.Y., at 566–567 of 86 N.E.2d. Speaking generally of purchasing activities as they fit within the New York doing business criteria, the court in Sterling stated that the same general criteria as are applicable to selling activities within the state are also applicable to purchasing activities within the state. "Continuity of action from a permanent locale is essential." Id. at 212 of 299 N.Y., at 565 of 86 N.E.2d. In Sterling, the New York Court of Appeals held that a South African corporation that acted as an exclusive buying agent for a South African importing corporation, its alter ego, was doing enough business to sustain service of process. The Court in Sterling made plain that it was distinguishing the facts before it from those facts which were presented in another line of cases, i. e., " * * * in which the foreign corporation's only ties with this State were through an independent resident buyer who acted for many other purchasers at the same time, see, e. g., Greenberg v. Lamson Brothers Co., 273 App. Div. 57, 75 N.Y.S.2d 233; nor one in which the foreign corporation came but intermittently or sporadically into New York on buying missions and had no fixed local headquarters. See, e. g., Rosenberg Bros. & Co. v. Curtis Brown Co., 260 U.S. 516 [43 S.Ct. 170, 67 L.Ed. 372]; Hamlin v. G. E. Barrett & Co., 246 N.Y. 554, 159 N.E. 648." Sterling Novelty Corp. v. Frank & Hirsch Distrib. Co., supra at 212 of 299 N.Y., at 566 of 86 N.E.2d.

The distinction drawn by the Court of Appeals between the facts in Greenberg v. Lamson Bros. Co., 273 App.Div. 57, 75 N.Y.S.2d 233 (1st Dept.1947), a case upon which defendant places much reliance, and the facts in Sterling Novelty effectively answers defendant's contentions bottomed on Greenberg. For unlike Greenberg v. Lamson Bros. the defendant herein did not employ a resident buyer who was not defendant's sole agent. In Greenberg, the residential buyer acted for forty-six out-of-town retail stores, including the defendant therein, in co-ordinating information on the wholesale market. The defendant in Lamson Brothers, an Ohio department store, purchased a substantial quantity of merchandise in New York, but all orders were accepted at its principal offices in Ohio. The court in Lamson indicated that while the amount of purchases was substantial, the defendant Lamson "maintains no exclusive buying agency of its own in this state." 273 App.Div. at 59, 75 N.Y.S.2d at 234. The Court also noted that "[Defendant Lamson Bros. Co.] has no office of its own here and no telephone listing. It owns no real estate here; it pays no taxes in this State; it holds no directors [sic] meetings here * * * its books are not kept here." Id. The facts in Lamson provide a marked contrast to the situation prevailing in Sterling Novelty and in the instant case, where purchasing is carried on, not by an agent of the defendant, as in Sterling, but by the defendant itself through an office maintained by its United States representative. Additionally, the consummation of purchase contracts in New York by the acceptance of bids here, the payment for purchases from the larger of the two bank accounts maintained here, the execution of all relevant documents here and the maintenance of the corporate purchasing records in New York, all point to the fact that the defendant is doing business here by the regular, continuous and systematic purchase of merchandise from a permanent location. See Sterling Novelty Corp. v. Frank & Hirsch Distrib. Co., supra. " * * * [T]he continued and organized buying of goods here by defendant is as much a part of its business operations as the sale of these goods to the

public. * * * [A] regular and long-continued practice of buying, instead of selling, is equally doing business." Fleischmann Const. Co. v. Blauner's, 190 App.Div. 95, 179 N.Y.S. 193, 194 (1st Dept. 1919); Accord: Kimberly Knitwear, Inc. v. Midwest Pool-Car Ass'n, 21 Misc.2d 730, 191 N.Y.S.2d 347 (Mun.Ct. 1959); Scheier v. Stoff, 142 N.Y.S.2d 716 (Sup.Ct. 1955); Pollak v. Western Dept. Stores, Inc., 136 N.Y.S.2d 393 (Sup.Ct. 1954); Emerson Radio & Phonograph Corp. v. Mayflower Sales Co., 124 N.Y.S.2d 83 (Sup.Ct. 1953); Hartstein v. Seidenbach's Inc., 129 Misc. 687, 222 N. Y.S. 404 (1st Dept. 1927); Meinhard, Greef & Co. Inc. v. Higginbotham Bailey-Logan Co., 262 App.Div. 122, 28 N.Y.S.2d 483 (1st Dept. 1941). See Annot. 12 A. L.R.2d 1439 (1949).

Although defendant, by the affidavit of its president, has acknowledged that its purchasing activities are essential to its business, in that it would be unable to operate without the equipment purchased through the New York office, it maintains, nevertheless, that since it is not conducting "some substantial part of its main business" in New York, it is not doing business here. Defendant emphasizes that its main and only business is selling and providing air transportation within Brazil and to five other South American countries; in New York its activity is limited to purchases of spare parts and supplies incidental to the providing of such transportation. Cruzeiro asserts that unlike the defendants in the "purchasing cases" it is not a retail or wholesale merchant engaged in the purchase and sale of goods; it does not resell the equipment and spare parts it purchases through the New York office but uses them to conduct its South American air transportation business. Cruzeiro contends that its purchasing activities constitute a "minor aspect of the complex of many different activities which are necessary for the conduct of its air transportation service." Thus, Cruzeiro's argument is to the effect that the determination of "doing business" should not be made without regard to the nature of the particular business involved and that mere ancillary or supporting activities to the business in chief do not constitute doing business for the purpose of sustaining *in personam* jurisdiction over a foreign airline. But the authorities cited in support of this proposition are not in point. Both Miller v. Surf Properties, Inc., 4 N.Y.2d 475, 176 N.Y.S.2d 318, 151 N.E.2d 874 (1958) and MacInnes v. Fontainebleau Hotel Corp., 257 F.2d 832 (2d Cir. 1958), involved out-of-state resort hotels whose totality of activity in New York brought them under the governance of the rule that mere solicitation of business without the existence of other factors indicating a continuous and regular course of business from a permanent location does not constitute "doing business" in New York. Holzer v. Dodge Bros., supra; Yeckes-Eichenbaum Inc. v. McCarthy, 290 N.Y. 437, 49 N.E.2d 517 (1943); Ray D. Lillibridge, Inc. v. Johnson Bronze Co., 220 App.Div. 573, 222 N.Y.S. 130, aff'd 247 N.Y. 548, 161 N.E. 177 (1928); Tauza v. Susquehanna Coal Co., supra.

In the Miller case, the Court of Appeals made clear that defendant's activities in New York were insufficient to constitute doing business since they amounted to mere solicitation and thus did not fall within the doctrine of International Shoe Co. v. Washington, 326 U.S. 310, 314, 66 S.Ct. 154, 157 (1945) that "solicitation * * * plus some additional activities * * * are sufficient to render the corporation amenable to suit." 176 N.Y.S.2d 318 at 321, 151 N.E.2d at 876. In Miller, the defendant's only contacts with New York were through its retention of a travel agency on a non-exclusive basis, along with 40 to 50 other hotels that used the same agency for the solicitation of resort business. The travel agency's activities on behalf of the defendant, generally, were limited to the answering of telephone inquiries concerning the availability of accommodations at the defendant's Miami Belmar Hotel, and the making of reservations in New York subject to confirmation in Miami. In MacInnes, the Fon-

tainebleau maintained its own sales office in New York which was staffed by three employees and which distributed information brochures, and forwarded inquiries and requests for reservations to Florida for answer and confirmation. A small inactive bank account was maintained in New York. The court emphasized that there was no claim made on the part of the defendant "that plaintiffs booked their reservations through the New York office." Finding that the situs of defendant's business was in Florida, the court found an absence of substantial activity in addition to solicitation to sustain *in personam* jurisdiction. 257 F.2d at 834.

█ The Miller and MacInnes opinions indicate that New York does not require that a substantial part of a corporation's "main business"—in this case Cruzeiro flights to and from New York—be conducted here in order to subject the foreign corporation to jurisdiction here. Had the defendants in Miller and MacInnes acted as a New York sales agency for the defendants by binding the hotels to honor the reservations made at the New York office, those cases would have taken on the character of the "solicitation plus" cases and a stronger case for finding "doing business" would have appeared. In any event, Miller and MacInnes do not support the defendant's position that an airline corporation that regularly and systematically purchases equipment essential for the operation of its line from a regularly established permanent New York office, all the while accepting bids and paying for orders in New York from funds maintained here, must actually operate its planes here in order for New York to say that the corporation is "here."

The rationale of Pomeroy v. Hocking Valley Ry., 218 N.Y. 530, 113 N.E. 504 (1916), and Lawson v. Pan American World Airways, Inc., 30 Misc.2d 274, 216 N.Y.S.2d 549 (Sup.Ct.1961) is at odds with defendant's position that a transportation company must actually carry on transportation activities within the state in order to "do business" within the

state. In both these cases the carrier corporations carried on extensive activities within the state without actually transporting passengers to and from the state. In Pomeroy, the Court stated:

"But of course there are certain undisputed general principles which may be applied to the disposition of such a question. The fact that the corporation is conducting the principal part of its business in the state of its incorporation does not prevent it from so prosecuting its business in another state as to bring it within the character of a corporation doing business in the latter state. While it is true that the business which it is conducting in the latter state in order to give the courts thereof jurisdiction over it for the purposes now being discussed must be part of the business for which it was organized, it cannot be necessary in every case that the transactions in said latter state shall be the performance of those particular acts which constitute the characteristic feature of the business for which the corporation was organized. It is not essential in this case that the defendant for the purposes now being discussed should here actually locate its tracks, operate its rolling stock or solicit traffic." Pomeroy v. Hocking Valley Ry. supra at 535 of 218 N.Y., at 505 of 113 N.E.

The Court pointed out that the holding of corporate meetings and the general supervision and management of the railroad, all of which took place in New York, was an "indispensable condition and incident" to the proper operation of the railroad. Cruzeiro's president has stated in his affidavit that it "must maintain a purchasing agent in the United States" and that it "would be impossible" for Cruzeiro "to operate its fleet without access to spare parts and other equipment." It is plain, therefore, that on a parity of reasoning, defendant's purchasing activities are an indispensable condition and incident to the proper operation of its airline.

The more recent Lawson case involved a situation in which Pan American acted pursuant to a broad and comprehensive general sales agency agreement for another South American carrier, Panair Do Brasil, S.A. Panair operated no flights into New York, but Pan American, acting as Panair's agent, went beyond the mere solicitation of business for Panair. In holding that Pan American's activities as agent for Panair were extensive and went beyond the mere solicitation of travel business, the Referee, whose report was confirmed by the New York Supreme Court, stated: "Nor do I consider it necessary, in concluding that the corporation is doing business here, to find each act of activity was in performance of the principal feature of the business for which the corporation was organized. (Pomeroy v. Hocking Valley Ry. Co., 218 N.Y. 530, 535 [113 N.E. 504, 505])", Lawson v. Pan American World Airways, Inc., supra at 551 of 216 N.Y. S.2d.

In sum, perhaps it may be argued that the defendant's activities are less extensive than the activities of some other foreign air carriers that have been held to be subject to the jurisdiction of the New York courts. See Fisher v. Ethiopian Airlines, Inc.; Wahl v. Pan American World Airways, Inc., 227 F.Supp. 839 (S.D.N.Y.1964); Lawson v. Pan American World Airways, Inc. supra; Berner v. United Airlines, Inc., supra; Goodman v. Pan American World Airways, Inc., 148 N.Y.S.2d 353 (Sup.Ct.1956). It is the fact, nevertheless, that defendant carries on with regularity a function vital to its operation from a permanent location in New York, Cf. KLM v. Superior Court, 237 P.2d 297 (Cal.Dist.Ct. App.1951), and these are sufficient regular and permanent minimum contacts for New York to be able to say that the corporation is doing business here.

▮ Defendant's contention that the exercise of *in personam* jurisdiction in this case would contravene the Fourteenth Amendment's due process clause under the test established by the Supreme Court in International Shoe Co. v. Washington, supra, and its progeny, is without merit. The test of jurisdiction is no longer based on a fictive concept of "presence" arising from transacting or doing business, McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), but is realistically based upon a balancing of competing interests to determine whether the exercise of jurisdiction violates the due process clause because it offends "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, supra at 316 of 326 U.S., at 158 of 66 S.Ct. The test has been stated in terms of "reasonableness" and "fairness" and the court must determine whether there are sufficient minimal contacts with the state to make it reasonable for the corporation to defend the suit at a place away from its "home" or "principal place of business." A relevant factor in determining the reasonableness of subjecting the corporation to *in personam* jurisdiction is whether the cause of action arose out of activities carried on within the forum. But the fact that the cause of action does or does not arise out of the corporation's activities within the state is not to be considered of such controlling importance, standing alone, that the presence or absence of such a factor should lead the court to ignore the totality of the corporation's other activities within the forum. In International Shoe and McGee, the corporations had no regular and permanent office within the state and their contacts with the respective states were less substantial and lasting than the contacts Cruzeiro has with New York. In McGee, the sole activity of the defendant in the state was the execution of the single insurance policy under which the cause of action arose, the mailing of a reinsurance offer to the insured and the delivery of the policy to the insured. But where a defendant's activities are regular and continuous and are more numerous than a single act or an isolated or casual connection with the state, it would appear fair and reasonable to subject the defendant to suit here, and the maintenance of jurisdiction would not

be unreasonable or unfair so as to violate the due process clause. In Arrowsmith v. United Press Int'l., supra at 233–234 of 320 F.2d, the court noted that the requirement that the suit arise out of the activity within the state meant that it was "owing either to the state * * * or to a resident." Here the obligation is owed to a resident of the State of New York, and in this sense the obligation arises out of a contact with this state. See Scholnik v. National Airlines, Inc. 219 F.2d 115 (6th Cir. 1955), cert. denied, 349 U.S. 956, 75 S.Ct. 882, 99 L.Ed. 1280 (1955).

Defendant's reliance on Arrowsmith v. United Press Int'l. supra, in support of its due process claim is unpersuasive. The constellation of facts in Arrowsmith presented an extreme case in which the forum had, at best, a fleeting contact with the lawsuit. Arrowsmith was a Maryland resident who sued United Press International, a New York corporation, for libel in the District Court in Vermont. The allegedly libelous news release originated in a U.P.I. dispatch from Atlanta, Georgia, and was transmitted over circuits leased from the Bell System to eleven Vermont subscribers to the U.P.I.'s wire service. U.P.I. had no office in Vermont but had one employee who occupied desk space in a general news room in the State House at Montpelier. This employee "punched out" news stories on a wire running to U.P.I.'s Boston office as well as to its Vermont broadcast subscribers. Arrowsmith did not allege that he was known to anyone in Vermont or had a "reputation" in Vermont. These facts, exhibited at best a tenuous and less than "minimal" connection between the State of Vermont, the defendant, and the plaintiff. The Court of Appeals, in dictum, indicated that were Vermont to assert jurisdiction under the above facts "this might well" violate the Fourteenth Amendment. 320 F.2d at 233. Cruzeiro's activities and contacts, however, are not so tenuous as to justify a similar concern by the court here, that jurisdiction in this district would contravene the

Fourteenth Amendment's due process clause.

Defendant's contention that plaintiff's suit must be dismissed under the doctrine of *forum non conveniens* is also unpersuasive. Although § 1404(a) of the Judicial Code, 28 U.S.C. § 1404 (a), relating to transfer of suits has codified the former *forum non conveniens* doctrine where the more convenient tribunal for trial of the action is another United States District Court, dismissal on *forum non conveniens* grounds is not an impossibility when the action should have been brought outside the United States. Vanity Fair Mills v. T. Eaton Co., 234 F.2d 633 (2d Cir. 1956), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956); Hendricks v. Alcoa Steamship Co., 206 F.Supp. 693 (E.D.Pa.1962); Glicken v. Bradford, 204 F.Supp. 300, 304 (S.D.N.Y. 1962). *Forum non conveniens* is a procedural doctrine that is governed by Federal rather than state law even in cases where jurisdiction is grounded on diversity of citizenship. Willis v. Weil Pump Co., 222 F.2d 261 (2d Cir. 1955); Ultra Sucro Co. v. Illinois Water Treatment Co., 146 F.Supp. 393, 396 (S.D.N.Y. 1956). The dismissal of an action on the grounds of *forum non conveniens* is a matter for the court's discretion, based upon a consideration of the following factors: relative ease of access to proof; availability of compulsory process to obtain the attendance of unwilling witnesses; the cost of obtaining the attendance of willing witnesses; "and all other practical problems that make trial of a case easy, expeditious and inexpensive." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). The defendant contends that one of many serious practical problems in this case is the thorny question of applying and interpreting a unique Civil Law concept—"Dolus," a concept which the defendant contends can more readily be dealt with by a Brazilian court, which has both a working knowledge of the Civil Law and the ability to understand Portuguese speaking witnesses. Defend-

-ant also points out that it would have to call "upwards of 20 witnesses" to defend the action in this district. And, in addition to other grievances, the defendant complains of the potentially burdensome cost of transporting its own employees to this forum. Although *forum non conveniens* remains a viable doctrine when the alternative forum is a court located outside the United States, it has been described as "a harsh rule and is applied in rather rare cases, since if the court invokes the doctrine it would have to dismiss the action," rather than transfer it to a more convenient forum, as it would be required to do if the alternative forum were another federal court. Glicken v. Bradford, supra, at 304 of 204 F.Supp. While earnestly urging its position that the action should be dismissed, defendant has been candid in its recognition of the oft-quoted statement, particularly applicable here, that "Unless the balance of convenience is strongly in favor of the defendant, a plaintiff's choice of forum will rarely be disturbed. * * * American citizens do not have an absolute right to sue in an American court. * * * [But] [w]here application of the doctrine of *forum non conveniens* would force American citizens to seek redress in a foreign court * * * courts of the United States are reluctant to apply the doctrine." Shulman v. Compagnie Generale Transatlantique, 152 F. Supp. 833, 836 (S.D.N.Y. 1956).

The court will not dismiss plaintiff's suit for the defendant has made an insufficient showing to warrant dismissal. Plaintiff is a United States citizen and a resident of New York. He has been treated by doctors here who may have to be called as witnesses on the damage aspects of plaintiff's case. Although it is plain that the situs of the accident is Brazil and persons who might have personal knowledge as to the circumstances of the accident reside there, the defendant's plea relating to the substantial financial burden that would be imposed upon it is one that serves the plaintiff equally well. For if the transportation of witness-employees will be expensive for defendant, an equally onerous burden would be imposed on plaintiff by requiring him to bring his action in Brazil. See State of Maryland v. Capital Airlines, 199 F.Supp. 335, 337 (S.D.N.Y. 1961).

The fact that this court possibly is not as familiar with the interpretation of Brazilian law, in general, and the concept of "dolus" in particular, as a Brazilian court may be, is not a factor that weighs very heavily upon the *forum non conveniens* scale. The task of deciding foreign law is a chore that the federal courts are called upon to perform with regularity. "There are, no doubt, difficulties in attempting to determine and apply foreign law; but the necessity to do so often occurs. The federal courts in diversity cases often encounter difficulty in determining the law of the very state in which they sit. * * * [T]he rules of the foreign law and their interpretation are simply questions of fact, and the conclusion is as reviewable as any other fact issue. * * *" Burt v. Isthmus Development Co., 218 F.2d 353, 357 (5th Cir. 1955); cert. denied, 349 U.S. 922, 75 S.Ct. 661, 99 L.Ed. 1254 (1955); Horovitz v. Renault, Inc., 162 F.Supp. 344 (S.D.N.Y. 1958).

The cases cited by defendant in support of its *forum non conveniens* position indicate that defendant has not accorded enough weight to the fact that plaintiff is an American citizen and resident of New York. Those cases, save one, were transitory actions, i. e., the plaintiffs were residents or nationals of a foreign country suing foreign corporations in the United States courts. Moutzouris v. National Shipping & Trading Co., 196 F. Supp. 482 (S.D.N.Y. 1961); Giatilis v. The Darnie, 171 F.Supp. 751 (D.Md. 1959); Heitner v. Zim Israel Nav. Co., 152 F.Supp. 3 (S.D.N.Y. 1957); Poutos v. Mene Grande Oil Co., 123 F.Supp. 577 (S.D.N.Y. 1954); DeSairigne v. Gould, 83 F.Supp. 270 (S.D.N.Y.) aff'd per curiam, 177 F.2d 515 (2d Cir. 1949), cert. denied, 339 U.S. 912, 70 S.Ct. 571, 94 L.Ed. 1338 (1950). In Vanity Fair Mills, Inc. v. T. Eaton Co., supra, the court invoked the *forum non conveniens*

doctrine, but that case involved the validity of defendant's trademark registration under Canadian trademark law. Although the doctrine was invoked the court did so with an express disclaimer that fully answers defendant's arguments herein: "Were this merely a transitory tort action in which disputed facts could be litigated as conveniently here as in Canada, we would think the jurisdiction of the district court should be exercised. But we do not think it the province of United States district courts to determine the validity of trade-marks which officials of foreign countries have seen fit to grant." 234 F.2d at 647.

Accordingly, the motion to dismiss or to quash service of the summons is denied. The motion to dismiss on the ground of *forum non conveniens* is denied.

So ordered.